UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | No. 2:07-CR-45 |
| V. | ) | District Judge Greer |
| | ) | Magistrate Judge Inman |
| JASON S. CRAIN | ) | |

**REPORT AND RECOMMENDATION**

In the first four counts of the indictment filed against defendant, he is charged with various offenses involving cocaine and crack cocaine. In the fifth count he is charged with possession firearms in furtherance of a drug trafficking crime. Some of the evidence against defendant will be a quantity of illegal drugs discovered in a suitcase which was in the trunk of a vehicle which was driven by defendant. He has filed a motion to suppress any evidence of those drugs. (Doc. 22). This motion has been referred to the United States Magistrate Judge under the standing orders of this Court and pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on September 13, 2007.

Three witnesses testified at the hearing, although only the testimony of two of those witnesses is important to this report and recommendation: Johnson City K-9 Officer Jeff Jenkins, and Jason Crain, defendant herein. There are disagreements between Officer Jenkins and defendant regarding a few of the facts; those disputed facts will be pointed out in the course of this report. However, all issues of credibility are resolved in favor of Officer

Jenkins and against defendant. Specifically, Officer Jenkins was an exceptionally creditable witness.

Officer Jenkins has been an officer with the Johnson City Police Department for sixteen years, and he has been a K-9 officer for twelve of those years. On February 1, 2007, the Drug Task Force was conducting an investigation involving defendant's drug dealings. Drug Task Force Agent Vicchio and other agents that day had executed a search warrant at defendant's storage unit, discovering illegal drugs therein. Agent Vicchio imparted this information to Officer Jenkins, requesting that Officer Jenkins stand by to assist the Task Force Agents later that day, if needed. Specifically, Vicchio requested that if defendant left his residence, Officer Jenkins should attempt to establish probable cause to make a traffic stop and, if he was able to do so, walk his drug dog around defendant's vehicle to ascertain if it contained drugs.

Pursuant to Vicchio's request, Jenkins and his drug dog, Tigger, took a position where they could follow defendant's vehicle if he left his residence. After approximately three hours, Jenkins received a radio transmission that defendant indeed had left his residence, driving a gold Honda Accord. Accordingly, Jenkins, accompanied by his drug dog, pulled into traffic behind defendant.

Jenkins "paced" defendant's vehicle, meaning that he drove precisely the same speed as defendant was driving, neither falling behind nor gaining on defendant's car. Jenkins determined that defendant was driving in excess of 50 miles per hour in a 45- mile-per-hour zone. Defendant testified that he was going only 48 miles per hour in a 45-mile-per-hour

2

zone; obviously the discrepancy between defendant and Officer Jenkins is of no legal consequence at all, inasmuch as even defendant admits he was exceeding the speed limit.

Jenkins activated his blue lights, and defendant pulled to the side of the highway in the vicinity of Grindstaff Chevrolet.

Jenkins called his dispatcher at 2:12 p.m. to report the traffic stop, telling the dispatcher that there was no need for the dispatcher to periodically check on his welfare. He also requested backup assistance. Officer Jenkins walked to the driver's window and told defendant that he was exceeding the speed limit and that the intended to issue him a citation. Defendant then asked Jenkins if he had been watching him. If Jenkins responded one way or the other, neither he nor defendant so testified.

Jenkins filled out a Warning Citation, and walked back to defendant's car to deliver it to him. Jenkins then asked defendant if he had any drugs or large sums of money in the car; defendant answered that he had $1500.00 in cash in his back pocket "to pay his rent."[1] Jenkins then asked defendant for permission to search the car; defendant refused. Jenkins then told defendant that he intended to walk his dog around the car. Jenkins thereupon "asked" defendant to get out of the car, and defendant did so. The United States went to some pains to suggest that defendant got out of his voluntarily, i.e., he "consented" to exit his car. Defendant, on the other hand, testified that he did not feel as if he had a choice, and he got out of his car to obey what he perceived to be the explicit instructions of Officer

---

[1] Defendant testified that he told Jenkins that he only $1200.00. Again, the discrepancy is of no significance since either figure is a rather significant amount of money to have in cash.

3

Jenkins that he do so. In this particular instance, defendant is believed. If a police office asks you to get out of your car, no reasonable person would believe he had the right to refuse and simply drive off. But with this said, it is of no significance to the resolution to the defendant's motion to suppress.

After defendant exited his car, he stood with the backup police officer; he was not handcuffed or physically restrained in any way. Officer Jenkins retrieved Tigger from his car. They walked to the front of defendant's vehicle to start the walk-around. As Tigger moved along the passenger side of defendant's car toward the rear, he alerted at the rear door on the driver's side. Jenkins then took Tigger to a new starting point and they walked about the car in the opposite direction; Tigger again alerted at the same place. Based upon Tigger's alert, and after replacing Tigger in his police car, Jenkins began to search defendant's vehicle. After finding nothing in the passenger compartment, Jenkins opened the trunk of the car using the keys he had extracted from the ignition. Defendant thereupon put his hands behind his back (without being told by anyone to do so) and exclaimed, "You've got me." Taken by surprise, Jenkins merely responded by saying, "What do you mean, 'We've got you?'" Defendant then answered, "There's a shit load of dope in that suitcase" and "This is the best day you've ever had."

Surely enough, there was a suitcase in the trunk. The suitcase had a lock on it; it is not clear whether it was one of those small, decorative padlocks that come with luggage, or whether the lock was part of the latching mechanism. In either event, Officer Jenkins testified that the lock was not locked. Defendant testified that it was locked. As noted earlier

in this report, this factual dispute is resolved in favor of Officer Jenkins.[2]

When the suitcase was opened, it indeed did contain a considerable amount of illegal drugs and drug paraphernalia. At 3:08 p.m., fifty-six minutes after the traffic stop, another vehicle arrived to transport defendant to the jail. The time of the transport officer's arrival is of no significance; defendant testified that from the time of the initial stop until the drug dog alerted on his car was approximately fifteen to twenty minutes, whereas Officer Jenkins testified that it was only ten minutes, at the most. Again, Officer Jenkins' version is the more credible. In this regard, it is recalled that Officer Jenkins did not have to request that a drug dog come to the scene; the drug dog was already sitting in Officer Jenkins car.

That the traffic stop was a mere pretext for the real reason, *viz*, to search for drugs, is of no legal significance so long as there was probable cause to believe that a traffic violation indeed occurred. *Whren v. United States*, 517 U.S. 806 (1996). It was undisputed that defendant was exceeding the speed limit; therefore, the pretextual traffic stop did not violate the Fourth Amendment.

Walking a drug-sniffing dog around a car that has been stopped for a traffic violation is not a search that implicates the Fourth Amendment so long as the time of the stop is not extended beyond that reasonably necessary to complete the procedures attendant to the traffic violations. Indeed, no articulable suspicion of criminal activity is needed; if the officer chooses to walk his dog around the car, he may do so so long as the time of the traffic stop

---

[2]It is stressed that it makes no difference whether or not the suitcase was locked, as discussed hereafter.

5

is not unduly extended. *Illinois v. Caballes*, 543 U.S. 405 (2005). The few extra minutes used for walking Tigger around defendant's car did not unduly extend the time of the traffic stop. But Officer Jenkins in fact had a reasonable and articulable suspicion that defendant might be transporting drugs. Defendant was a known drug dealer, and a search of his storage room earlier that day had resulted in a seizure of a quantity of marijuana. He had $1500.00 in cash on his person. Whether with or without a reasonable and articulable suspicion that defendant was transporting drugs, Officer Jenkins lawfully walked his dog around defendant's vehicle during the course of the traffic stop. The time required for him to do so required only a very few minutes, perhaps four or five, very likely less. Again, it must be recalled that Jenkins did not have to call for a dog; Tigger was already with him at the traffic stop. *See, e.g., United States v. Suarez*, 1995 WL 29454 at *4 (6th Cir. 1995); *United States v. Burris*, 78 Fd. Appx. at 525, 528 (6th Cir. 2003).

When Tigger, a trained and certified drug-detection dog, positively alerted on defendant's vehicle, Officer Jenkins had probable cause to believe that the vehicle contained illegal drugs. *United States v. Berry*, 90 F.3d 148, 153 (6th Cir. 1996). Because of the inherent mobility of vehicles, Jenkins' probable cause to search the vehicle extended to "every part of the vehicle *and all containers found therein in which contraband could be hidden*." *United States v. Crotinger*, 928 F.2d 203, 205 (6th Cir. 1991) [Italics supplied]. The nature of the container found inside the vehicle does not define the scope of the search. *Id.* Whether or not those containers are locked makes no difference. Jenkins could conduct a warrantless search of a vehicle that was "as thorough as a magistrate could authorize in a

warrant." *United States v. Ross*, 456 U.S. 798, (1982). This magistrate judge could have issued a warrant authorizing the search of defendant's car and all containers within it, and that warrant would have carried with it the implicit authorization to remove any impeding locks on those containers.

Defendant also attacked the ability and training of the drug dog, Tigger. Tigger had orthopaedic problems, and he recently had been shot in the line of duty. But he was a seven-year veteran, duly trained and certified, and there was no evidence to remotely suggest that his physical ailments compromised his abilities to detect the odor of drugs.[3]

## *CONCLUSION*

It is respectfully recommended, for the reasons stated above, that defendant's motion to suppress be denied.[4]

Respectfully submitted,

s/ Dennis H. Inman<br>United States Magistrate Judge

---

[3] Rather obviously, he successfully ferreted out defendant's cache of drugs.

[4] Any objections to this report and recommendation must be filed within ten (10) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).